*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2016).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-1451**

In the Matter of the Welfare of
the Children of: A.T. and J.T.,
Parents.

**Filed February 21, 2017
Affirmed
Jesson, Judge**

Sherburne County District Court
File No. 71-JV-16-270

David C. Olson, Lanners and Olson, P.A., Plymouth, Minnesota (for appellant-mother A.T.)

Kathleen A. Heaney, Sherburne County Attorney, Tracy J. Harris, Assistant County Attorney, Elk River, Minnesota (for respondent county)

Lisa Rutland, Rutland Law, PLLC, Princeton, Minnesota (for respondent-father J.T.)

Kathleen Fisher, Monticello, Minnesota (guardian ad litem)

Considered and decided by Halbrooks, Presiding Judge; Cleary, Chief Judge; and Jesson, Judge.

## UNPUBLISHED OPINION

**JESSON**, Judge

Appellant-mother A.T. challenges the termination of her parental rights. Because clear and convincing evidence supports the district court's determinations that reasonable

efforts failed to correct conditions leading to the children's out-of-home placement and termination is in the children's best interests, we affirm.

## FACTS

The three children of mother, A.T., and father, J.T., were born in 2007, 2009 and 2014. Midway through their ten-year relationship, the couple married in 2010. Shortly thereafter, their relationship became violent. In 2011, father assaulted mother, who was hospitalized with a concussion.[1] The couple separated in 2014, although they remain married.

In 2014 the family moved to a home in Big Lake, which is in Sherburne County. Beginning in late 2014, a series of child-maltreatment and neglect reports regarding the family funneled into Sherburne County Social Services.[2] These reports included educational-neglect concerns for the older children due to lengthy absences from school; allegations of drug use at the home in the presence of the children; that the family home was a "drug house"; concerns over the family's eviction in June 2015 and subsequent

---

[1] The family resided in Wright County at the time of the domestic assault. Wright County Social Services responded to a child-maltreatment report related to the assault, although the record is unclear what services were provided at the time.

[2] Upon receiving a report of child abuse or neglect, the local agency reviews that information and determines if the alleged maltreatment meets the threshold for child maltreatment. Minn. Stat. § 626.556, subd. 7(b) (2016). If it does, the report is assigned to either an assessment or an investigation track. Through family assessment, the local government agency evaluates child safety, risk factors, and the family's strengths and its needs. *Id.*, subd. 2(d). The family may then be referred to community resources to address family needs such as housing, transportation, and counseling services. Alternatively, the local agency may conduct a child-protection investigation for serious reports of child abuse and neglect, which includes fact finding to determine whether maltreatment occurred or whether protective services are required. *Id.*, subd. 2(e).

homelessness; and mental-health reports regarding mother, including a report that she was hearing voices. Through a family assessment process, Sherburne County offered services during this time, some of which mother specially sought.[3] In addition, in August 2015, upon recommendation by the county, Dr. David Brunetti conducted a psychological examination on mother. According to his examination, mother displayed a psychotic illness, which may be exacerbated by an existing post-traumatic stress disorder or underlying personality disorder. He recommended that she see a psychiatrist for medication to help stabilize her mental health.

Despite some assistance from Sherburne County in response to these reports, the family was homeless once again in September 2015. On September 29, after receiving an additional report that the two older children had missed eight school days, Sherburne County opened a child-protection investigation. Two days later, law enforcement responded to a call from a local shelter, Place of Hope, where they found the oldest children alone. When mother arrived with the baby clad only in a diaper, she said she was shopping at the mall. All three children were placed on an emergency 72-hour welfare hold. When interviewed, the older children shared that every time they ate dinner, mother would tell them they were eating corpses and drinking the blood of their grandfather.[4]

---

[3] Mother was receptive to some county services, but not others. When Sherburne County learned that the family could no longer stay with the children's grandmother, it paid for a two-night stay in a hotel for the family. But when overnight housing services were recommended, mother declined. Mother also rejected temporary relative foster care while she looked for housing.

[4] At trial, mother acknowledged that this statement was not "mature" and that "maybe in [the] kids' perspective, it could get misunderstood."

The children were placed in foster care, and on October 6, 2015, Sherburne County filed a child in need of protection or services (CHIPS) petition. By the time of the CHIPS petition, the county had received over 15 reports about the family regarding neglect, maltreatment, and mental-health concerns.

The district court adjudicated the children CHIPS and ordered mother to complete a case plan. The plan provided that mother: maintain current mental-health services, attend visitation with the children, demonstrate an ability to maintain safe housing, maintain medical services and meet the medical needs of the children, gain insight into her own mental health and how it affects her parenting, and follow through with other services as necessary.

While receiving services during the pendency of the CHIPS proceeding, mother had supervised visitation with the children. The visits were originally set in the community, but after an incident when mother attempted to follow the children home (to learn the location of the foster home), visitations moved to a secure facility in St. Cloud. Parenting education sessions occurred prior to the visits. Neither progressed smoothly. During parenting-education sessions, mother was defensive and said she did not need someone telling her how to parent. In visitation with the children, mother discussed inappropriate topics. She also engaged in power struggles with the oldest child. In one example, mother insisted that the oldest child was performing poorly in school even though a social worker learned from the school that the child was improving. As a result, the oldest child reported that she was doing poorly. Mother made some improvements in late February. However, beginning in mid-March, mother began to cancel and miss visits. In early April, mother

4

was civilly committed as mentally ill. Supervised visitation ended, although mother had sporadic interactive television and phone visits during her commitment both while hospitalized and in intensive residential treatment.

In addition to visitation, mother's court-ordered case plan required her to complete testing to identify services to address her mental-health symptoms and to follow through with all recommendations from mental-health providers. Mother was already in counseling since 2014 with an individual therapist, Kelly Berscheit. According to Berscheit, who continued to treat mother during the pendency of the CHIPS proceedings, mother is "in the beginning phase of addressing her mental health." Berscheit diagnosed mother with adjustment disorder; psychosis (hallucinations and delusions) linked to stress and anxiety; post-traumatic-stress disorder from sexual abuse as a child, as well as from the loss of a home due to a fire when she was a young adult; and attention deficit disorder. She also reported memory difficulties related to dissociative episodes.

A psychological examination was completed by psychologist Dr. Beth Jones in December 2015. The examination revealed that mother had deficits in her auditory and visual memory, suggesting cognitive impairment. Dr. Jones diagnosed mother with an unspecified neurocognitive disorder and recommended further psychological testing with a neurologist.

After meeting with mother from January to March 2016, Dr. Frayda Rosen, a psychologist, conducted a psychological evaluation and parenting-capacity assessment. Dr. Rosen found that mother displays a personality disorder with severe adjustment difficulties. Significant limitations impede her ability to learn, retain, and utilize new

5

information. She lacks a good understanding about what children are able to comprehend. Dr. Rosen recommended intensive long-term individual therapy, focusing on mother's understanding and stabilization of her mental health. She concluded that "[t]he prognosis appears poor for [mother] being able to meet her individual needs and therefore being able to meet her children's parental needs at this time."

Shortly after this evaluation, in late March 2016, local police found mother locked in her mother's bathroom, claiming that she was seeing dead bodies and that people were trying to kill her. She was placed on a 72-hour mental-health hold. Shortly thereafter, she was civilly committed as mentally ill and transferred to St. Mary's hospital. At St. Mary's, mother was diagnosed with: post-traumatic stress disorder, neuro-cognitive disorder, borderline intellectual functioning, and multiple traumatic brain injuries. After discharge from the hospital, mother moved to intensive residential treatment in New Ulm where she continued to reside at the time of trial.[5]

Shortly after mother was civilly committed, a petition to terminate her parental rights was filed on May 5, 2016.[6] On May 24, the district court approved moving the children to relative foster care, finding that the county had made reasonable efforts in their relative search. A trial on the termination petition was held in July. The district court heard testimony from social workers from Sherburne and Wright counties, a visitation supervisor,

---

[5] Mother was not fully participating in her mental-health treatment in July 2016. The residents of the intensive residential treatment program are expected to participate at a 90% rate. At the time of trial, mother participated in only 62% of programming. Mental-health staff reported that she failed to adequately participate in the sessions she did attend.

[6] The petition also sought to terminate the parental rights of the biological father of the children, J.T. J.T. voluntarily terminated his parental rights at trial in July 2016.

6

the children's non-relative foster mother, paternal and maternal family members, the guardian ad litem, and mother. Mother and Sherburne County stipulated to the admission of numerous psychological evaluations and medical records.

The district court ordered mother's parental rights to the children terminated, ruling that mother failed to comply with her parental duties and is palpably unfit to parent the children. Noting that her mental illness is directly related to her ability to parent, the district court found that her progress was not sufficient to enable her to parent her children in the foreseeable future. The district court further concluded that reasonable efforts failed to correct the conditions leading to the out-of-home placement. Finally, the district court concluded that termination of parental rights was in the children's best interests. The court stated:

> [Mother] cares about the children and wants to maintain her relationship with them. However, [mother] is currently under civil commitment and acknowledges dealing with her mental health issues must be her primary focus. The children also care for their mother and miss her. However, the children are thriving outside [mother's] custody and developing important relationships with the [foster family]. . . . The children are also in a safe environment with stable housing and consistent supervision. [Mother] failed to provide these basic needs and services for the children while their guardian. It may be years before [mother's] mental health allows her to be an effective parent. The record indicates termination of [mother's] parental rights is in the children's best interest.

Mother appeals.

7

## D E C I S I O N

**I. Clear and convincing evidence supports the district court's termination of mother's parental rights on the ground that reasonable efforts have failed to correct the conditions leading to the children's out-of-home placement.**

Mother contends that the district court clearly erred by finding that Sherburne County made reasonable efforts to rehabilitate her and reunify the family. Appellate courts will affirm the district court's termination so long as clear and convincing evidence supports at least one statutory ground for termination and termination is in the best interests of the child. *In re Welfare of Children of R.W.*, 678 N.W.2d 49, 55 (Minn. 2004). A statutory basis for termination of parental rights exists if "following the child's placement out of the home, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the child's placement." Minn. Stat. § 260C.301, subd. 1(b)(5) (2016). The county must provide real, genuine assistance that goes beyond matters of form. *In re Welfare of Children of S.W.*, 727 N.W.2d 144, 150 (Minn. App. 2007), *review denied* (Minn. Mar. 28, 2007); *see also* Minn. Stat. § 260.012(h) (2016) (requiring efforts to be adequate to meet the family's specific needs, culturally appropriate, available and accessible, consistent and timely, and realistic).

A review of the record demonstrates that Sherburne County provided the following services to the family during the pendency of this matter: foster-care placement; supervised visitation; parenting education; psychological assessments; individual counseling; neuropsychological tests for mother; and coordination of mental health services. Since early 2015, the county created numerous case plans designed to help address the family's

homelessness and the older children's truancy. To develop these plans, the county often met with mother to generate options on how to address her mental-health issues and homelessness.[7]

Sherburne County also attempted to coordinate mother's mental-health services after learning that she failed to show up at appointments. The county contacted mother to assist in scheduling the necessary appointments. But mother was unreceptive and refused to sign medical releases, which would have allowed the county to coordinate these services. Instead, mother insisted on setting up all the services herself, despite her previous struggles to obtain the appropriate services. This ultimately led to a delay in mother's ability to stabilize and address her mental health. Nonetheless, the county met with mother throughout this matter to help her try to comply with the court-ordered case plan. But shortly after mother was able to schedule mental-health assessments and day treatment, she was civilly committed.

The district court found that the variety of services offered by Sherburne County constituted reasonable efforts to reunify the family. The district court made numerous, specific findings regarding mother's struggles with supervised visitation, noting that her visits with the children were chaotic and "highlighted [mother's] lack of parenting skills." The court also explicitly addressed mother's mental health in findings concluding that,

---

[7] Sherburne County also offered services to the family before the CHIPS proceeding. For example, it found a summer camp for the older children after learning that they had missed a substantial number of days in school and offered to provide transportation to the camps as well. While the family was homeless, the county also requested housing and day care services on mother's behalf. But mother ultimately rejected these services.

while her "mental health improved as a result of her commitment," she still lacks insight into her mental health and fails "to acknowledge her delusions and other serious mental health issues." Finally, the court addressed mother's lack of suitable housing for the children, which was one of the conditions leading to out-of-home placement. As the district court found:

> [Mother] has not complied with her Court ordered case plan. [Mother] does not have suitable housing for the children. [Mother] has not consistently attended visitation and followed visitation rules. [Mother] has not maintained services for the children and is currently not in a position to do so. [Mother] still lacks insight into her own mental health and how it affects her parenting.

Mother argues that her difficulty complying with her case plan was caused by her significant memory problems and that Sherburne County failed to make reasonable efforts to address her memory problems. We disagree. Here, the court-ordered examination by Dr. Beth Jones in the CHIPS proceeding revealed mother's auditory and visual memory problems. To accommodate mother, Sherburne County followed Dr. Jones' recommendation to meet with mother in person and to provide mother with written instructions. However, mother's refusal to sign medical releases, which would allow the county to directly coordinate services, was an impediment to addressing mother's medical challenges, including her memory problems.

Upon a careful review of the record, we conclude that the district court's findings are supported by clear and convincing evidence. Sherburne County made reasonable

efforts to help reunify the family. Despite these efforts, mother was unable to remedy the conditions that led to the children's placement in foster care.[8]

> **II. The district court did not abuse its discretion when it found that termination of mother's parental rights is in the best interests of the children.**

After a determination that one of the statutory grounds for termination of parental rights has been met, "the best interests of the child must be the paramount consideration." Minn. Stat. § 260C.301, subd. 7 (2016). "In analyzing the best interests of the child, the court must balance three factors: (1) the child's interest in preserving the parent-child relationship; (2) the parent's interest in preserving the parent-child relationship; and (3) any competing interest of the child." *In re Welfare of R.T.B.*, 492 N.W.2d 1, 4 (Minn. App. 1992). The child's competing interests include "a stable environment, health considerations, and the child's preferences." *Id.* "Where the interests of parent and child conflict, the interests of the child are paramount." Minn. Stat. § 260C.301, subd. 7. We review a determination that termination is in a child's best interests for an abuse of discretion. *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 905 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012).

---

[8] Here, the district court terminated mother's parental rights on two statutory grounds: that mother was palpably unfit to parent and that mother's reasonable efforts to correct the conditions leading to the out-of-home placement had failed. A district court need only to establish at least one statutory ground for termination by clear and convincing evidence and that termination is in the best interests of the child. *In re R.W.*, 678 N.W.2d at 55. Because we conclude that termination of parental rights is established under the reasonable-efforts ground, we need not reach the issue of whether mother is palpably unfit to parent.

Here, the district court found that, while mother and the children have an interest in preserving their relationship, termination of parental rights is in the children's best interests. The district court emphasized that the children are thriving in foster care. They are improving in school. Their behavioral issues are being addressed, and they are in stable housing and under consistent supervision. Mother was unable to provide this stability in the past. And as the district court noted, given mother's ongoing mental-health condition and treatment, it may be years before she could be an effective parent. The district court's best interests finding is well supported by the medical records, the opinion of the guardian ad litem, the testimony of social workers, and, indeed, much of mother's testimony as well. The district court concluded that termination of mother's parental rights is in the children's best interests. We agree.

**Affirmed.**